Matter of D'Angelo (2017 NY Slip Op 09277)





Matter of D'Angelo


2017 NY Slip Op 09277


Decided on December 29, 2017


Appellate Division, Second Department


Per Curiam.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on December 29, 2017
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

RANDALL T. ENG, P.J.
WILLIAM F. MASTRO
REINALDO E. RIVERA
MARK C. DILLON
RUTH C. BALKIN, JJ.


2016-01326

[*1]In the Matter of Frank G. D'Angelo, Jr., an attorney and counselor-at-law. Grievance Committee for the Tenth Judicial District, petitioner; Frank G. D'Angelo, Jr., respondent. (Attorney Registration No. 2069243)



DISCIPLINARY PROCEEDING instituted by the Grievance Committee for the Tenth Judicial District. By decision and order on motion of this Court dated August 24, 2016, the Grievance Committee was authorized to institute and prosecute a disciplinary proceeding against the respondent based on the acts of professional misconduct set forth in a verified petition dated January 28, 2016, the respondent was barred, based upon the doctrine of collateral estoppel, from relitigating any of the factual allegations raised in charges one through four of the petition, and the matter was referred to the Honorable Elaine Jackson Stack, as Special Referee, to hear and report. The respondent was admitted to the Bar at a term of the Appellate Division of the Supreme Court in the Second Judicial Department on July 9, 1986.



Catherine A. Sheridan, Hauppauge, NY (Robert H. Cabble of counsel), for petitioner.
Michael F. Mongelli II, P.C., Flushing, NY, for respondent.



PER CURIAM.


OPINION & ORDER
The Grievance Committee for the Tenth Judicial District served the respondent with a verified petition, dated January 28, 2016, containing 12 charges of professional misconduct. Following a prehearing conference on December 1, 2016, and a hearing on January 30, 2017, and February 14, 2017, the Special Referee sustained all the charges. The Grievance Committee now moves to confirm the Special Referee's report and impose such discipline as the Court deems just and proper. The respondent opposes the motion to the extent that charges three, seven, and eleven, each alleging that the respondent engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation, were sustained. The respondent contends that the cases cited by the Grievance Committee are inapposite, and that disbarment is not warranted. The respondent asks that the Court impose a public censure in view of the mitigating circumstances.
Charges One to Four: Surcharge
Charge one alleges that the respondent engaged in conduct that adversely reflects on his fitness as a lawyer, in violation of former Code of Professional Responsibility DR 1-102(a)(7) (22 NYCRR 1200.3[a][7]) and its successor, rule 8.4(h) of the Rules of Professional Conduct (22 NYCRR 1200.0), as follows: By order dated September 30, 1997, the Supreme Court, Queens County, determined that Albert K. was unable to manage his person and property by reason that his functional level was substantially impaired by dementia, and appointed a guardian for his person and property pursuant to article 81 of the Mental Hygiene Law. By order dated July 23, 2004, the [*2]Supreme Court, Queens County, appointed the respondent the successor guardian of the person and property of Albert K., who was then a 76-year-old incapacitated person. In and around early 2007, the respondent, in his capacity as guardian, appointed his wife, Ann Marie D'Angelo (hereinafter Ann Marie), as the nurse geriatric care manager for Albert K. Ann Marie provided geriatric care management services to Albert K. through her solely-owned entity named Family Care Connections, LLC (hereinafter Family Care), which she formed in and around January 2007. Family Care operated from the same office suite as the respondent's law firm. The respondent paid to Family Care out of Albert K.'s estate the aggregate sum of $111,881.98 for services to Albert K.
In an order dated October 13, 2009, the Supreme Court, Queens County, among other things, confirmed the report of a court-appointed examiner regarding the respondent's accounts pertaining to the guardianship of Albert K., and directed a hearing to be held to address the objections of the examiner to the payments the respondent made to Family Care on Albert K.'s behalf, and whether the respondent should be surcharged for those payments. A hearing was held on December 7, 2009, at which the respondent and Ann Marie offered testimony.
In a decision dated December 8, 2010, the Supreme Court determined that the respondent's final account should be approved; however, it determined that the sum of $108,881.59 constituted excessive fees paid to Family Care and Ann Marie. It approved the sum of only $3,000 paid to Family Care for the period May 2007 through September 2007, when Albert K. was at home. The Supreme Court further determined that: (1) the respondent should be denied commissions and an attorney's fee, "as his actions were in the best interests of him and his family rather than his ward"; (2) the respondent was personally liable to pay the court examiner's legal fees in the amount of $14,625 for identifying and asserting objections to the account; and (3) the respondent should be surcharged the amount of the foregoing items in the aggregate sum of $123,506.59, without interest. The Supreme Court issued an order dated December 28, 2010, consistent with its decision dated December 8, 2010, judicially settling the account. In an order dated May 11, 2011, the Supreme Court denied the respondent's motion for reargument.
The respondent appealed the order to this Court, and the Public Administrator of Queens County (hereinafter the Public Administrator) cross-appealed. By decision and order dated June 6, 2012, this Court affirmed the order insofar as appealed from, reversed the order insofar as cross-appealed from, and granted the Public Administrator's request to include 9% interest on the sum surcharged (see Matter of Albert K. [D'Angelo], 96 AD3d 750). This Court found, inter alia, that to the extent that the court examiner's fees exceeded the statutory guidelines, the respondent's "covert self-dealing demonstrates the requisite extraordinary circumstances' which entitle a court to depart from the statutory schedule" (id. at 753, quoting 22 NYCRR former 806.17[c]).
Charge two alleges that the respondent engaged in conduct prejudicial to the administration of justice, in violation of former Code of Professional Responsibility DR 1-102(a)(5) (22 NYCRR1200.3[a][5]), and rule 8.4(d) of the Rules of Professional Conduct (22 NYCRR 1200.0), based on the factual specifications alleged in charge one. Charge three alleges that the respondent engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation, in violation of former Code of Professional Responsibility DR 1-102(a)(4) (22 NYCRR 1200.3[a][4]), and rule 8.4(c) of the Rules of Professional Conduct (22 NYCRR 1200.0), based on the factual specifications alleged in charge one. Charge four alleges that the respondent engaged in a conflict of interest in which his professional judgment was, or was at risk of being, adversely affected by his own financial, business, property, or other interests, in violation of former Code of Professional Responsibility DR 5-101(a) (22 NYCRR 1200.20[a]), and/or rule 1.7(a)(2) of the Rules of Professional Conduct (22 NYCRR 1200.0), based on the factual specifications alleged in charge one.
Charges Five to Eight: Sale of Bridgehampton Property
Charge five alleges that the respondent engaged in conduct that adversely reflects on his fitness as a lawyer, in violation of former Code of Professional Responsibility DR 1-102(a)(7) (22 NYCRR 1200.3[a][7]) and its successor, rule 8.4(h) of the Rules of Professional Conduct (22 NYCRR 1200.0), as follows: In his capacity as guardian for Albert K., the respondent determined that it was in the best interest of Albert K. to sell a real estate parcel owned by Albert K. located in Bridgehampton (hereinafter the Bridgehampton property). The respondent negotiated the sale of the Bridgehampton property with attorney Carolyn Naranjo, who acted as the real estate broker for the purchasers, through her real estate brokerage, Elleira Realty Corp. (hereinafter Elleira Realty). The respondent and Naranjo knew each other from their involvement in the Columbian Lawyers Association, and Naranjo occasionally referred clients to the respondent's law firm.
As guardian for Albert K., the respondent executed a contract of sale for the Bridgehampton property, dated December 8, 2005. Among other things, the contract provided for a purchase price of $3.1 million, the appraised value of the property. The contract of sale provided that the purchasers, Gregory G. Galdi and Linda M. Galdi, had not dealt with any other realtor except Elleira Realty, and that the purchasers agreed to pay the brokerage commission earned thereby pursuant to a separate agreement. Pursuant to a letter dated December 7, 2005, the purchasers agreed to pay Elleira Realty a purchaser's commission of 3% of the purchase price of the Bridegehampton property. The purchasers eventually paid to Elleira Realty the sum of $94,200 in connection with the purchase of the Bridgehampton property. Naranjo formed Elleira Realty on or about December 5, 2005.
At the time of the contract of sale for the Bridgehampton property, the respondent was also a real estate broker. The respondent engaged Naranjo to form a real estate brokerage, Castleworks Realty, LLC (hereinafter Castleworks), which was formed on or about December 14, 2005. Castleworks was located in the same office suite as the respondent's law firm, and Ann Marie was the chair or chief executive officer and registered agent for Castleworks. The respondent was a signatory on the bank account of Castleworks.
The respondent testified at an examination under oath that he and Naranjo formed their respective real estate brokerages to work together in real estate matters to supplement their law practices.
After obtaining court approval for the sale of the Bridgehampton property, the closing occurred on or about March 31, 2006.
In and around April 2006, the respondent received a check from Elleira Realty, drawn on its account, dated April 13, 2006, in the amount of $47,100, payable to Castleworks. The memo section of the check referenced "Galdi-Bridgehampton." The respondent deposited the check into the corporate account for Castleworks. The proceeds were later disbursed by the respondent for various purposes, including to his law firm and his and Ann Marie's personal accounts. Castleworks performed no brokerage services in the marketing and sale of the Bridgehampton property, and there was no co-brokerage agreement between Castleworks and Elleira Realty for the Bridgehampton property.
The respondent did not disclose to the Supreme Court, which had approved the sale of the Bridgehampton property, that he had received, deposited, and disbursed one-half of the commission Elleira Realty received in connection with the sale of the Bridgehampton property.
Charge six alleges that the respondent engaged in conduct prejudicial to the administration of justice, in violation of former Code of Professional Responsibility DR 1-102(a)(5) (22 NYCRR 1200.3[a][5]), and rule 8.4(d) of the Rules of Professional Conduct (22 NYCRR 1200.0), based on the factual specifications alleged in charge five. Charge seven alleges that the respondent engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation, in violation of former Code of Professional Responsibility DR 1-102(a)(4) (23 NYCRR 1200.3[a][4]), and rule 8.4(c) of the Rules of Professional Conduct (22 NYCRR 1200.0), based on the factual specifications alleged in charge five. Charge eight alleges that the respondent engaged in a conflict of interest in which his professional judgment was, or was at risk of being, adversely affected by his own financial, business, property, or other interests, in violation of former Code of Professional Responsibility DR 5-101(a) (22 NYCRR 1200.20[a]), and rule 1.7(a)(2) of the Rules of Professional Conduct (22 NYCRR 1200.0), based on the factual specifications alleged in charge five.
Charges Nine to Twelve: Wills
Charge nine alleges that the respondent engaged in conduct that adversely reflects on his fitness as a lawyer, in violation of former Code of Professional Responsibility DR 1-102(a)(7) (22 NYCRR 1200.3[a][7]) and its successor, rule 8.4(h) of the Rules of Professional Conduct (22 NYCRR 1200.0), as follows: On or about May 22, 1997, approximately 21 days prior to the petition for the appointment of a guardian, Albert K. executed a will (hereinafter the 1997 will). The 1997 will provided, among other things, that Albert K.'s partner, Seymour Russman, was to be executor and a principal beneficiary. In and around April 2009, Russman died.
The respondent apprised Albert K. of Russman's death. At that time, Albert K., who was living at the Sands Point Nursing Home, was still afflicted with a language disorder known as aphasia as a result of a stroke, and was largely confined to bed. On May 8, 2009, the respondent drafted a will (hereinafter the May 8, 2009, will) for Albert K., who executed the will in his room in the nursing home. Albert K. could not read the will, so the respondent read it to him. The May [*3]8, 2009, will was witnessed by Ann Marie and the respondent's mother. The May 8, 2009, will provided that the respondent was the sole executor, and provided for the creation of a charitable trust with the respondent as the sole trustee, to handle the assets of Albert K.'s estate, which exceeded $3 million.
On or about July 8, 2009, Albert K. executed another will (hereinafter the July 8, 2009, will). There were no witnesses to this execution. The July 8, 2009, will was virtually identical to the May 8, 2009, will, with the exceptions that Ann Marie was named as alternate executor, and she was also named as alternate trustee for the $3 million trust.
The $3 million charitable trust provided for in the May 8, 2009, will was not created or established. The respondent did not prepare, and Albert K. did not execute, an inter vivos trust document to create the $3 million charitable trust.
Albert K. died on July 29, 2009.
The respondent offered for probate the May 8, 2009, will, and the Surrogate's Court of Queens County issued him preliminary letters on or about September 22, 2009. The Public Administrator petitioned the Surrogate's Court to direct the respondent to produce the 1997 will. By order dated December 8, 2009, the Surrogate's Court ordered an inquiry under SCPA 1401, and directed the respondent to attend and submit to an examination, and to produce and file any paper writings purporting to be the last will and testament of Albert K.
In a separate order dated December 8, 2009, the Surrogate's Court directed that the Public Administrator may petition for the denial of probate of the May 8, 2009 will; that temporary letters of administration be issued to the Public Administrator; that the preliminary letters issued to the respondent be suspended; and that a hearing would be held on January 7, 2010, to determine whether to revoke the respondent's preliminary letters.
In a decree dated January 26, 2010, upon the respondent's consent, the Surrogate's Court revoked the respondent's preliminary letters.
By decree dated August 25, 2010, upon the stipulation of the parties dated July 29, 2010, the May 8, 2009, will was denied probate.
In a decision dated July 16, 2012, the Surrogate's Court determined that the 1997 will would be denied probate, since at the time of its execution Albert K. lacked testamentary capacity. The court based its decision on the report of a competency evaluation administered to Albert K. on June 9, 1997, by Dr. James J. Johnson, Jr., done in connection with the petition to appoint a guardian pursuant to article 81 of the Mental Hygiene Law. The court noted that the report stated, in pertinent part, that Albert K. suffered "from a severe and probably progressive neurologic disease known as multi-infarct dementia," and that he had "severe impairment of his language and comprehension of his surroundings."
Charge ten alleges that the respondent engaged in conduct prejudicial to the administration of justice, in violation of former Code of Professional Responsibility DR 1-102(a)(5) (22 NYCRR 1200.3[a][5]), and rule 8.4(d) of the Rules of Professional Conduct (22 NYCRR 1200.0), based on the factual specifications alleged in charge nine. Charge eleven alleges that the respondent engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation, in violation of former Code of Professional Responsibility DR 1-102(a)(4) (22 NYCRR1200.3[a][4]), and rule 8.4(c) of the Rules of Professional Conduct (22 NYCRR 1200.0), based on the factual specifications alleged in charge nine. Charge twelve alleges that the respondent engaged in a conflict of interest in which his professional judgment was, or was at risk of being, adversely affected by his own financial, business, property, or other interests, in violation of former Code of Professional Responsibility DR 5-101(a) (22 NYCRR 1200.20[a]), and rule 1.7(a)(2) of the Rules of Professional Conduct (22 NYCRR 1200.0), based on the factual specifications alleged in charge nine.
Special Referee's Report
The Special Referee sustained all 12 charges, concluding in her report as follows:
"Respondent demonstrated little remorse for his conduct. He did suggest, in some instances, that it might have been prudent to have involved the court either for consent or advice, in some of the matters before us. For the most part, he seemed to suggest that it was all really all right and that his conduct should not be subject to discipline.
"Much of the conduct complained of demonstrated that respondent [*4]was eager to increase his income and that he could do so by donning the two hats' referred to by his wife in another context. Their incomes were intertwined. He paid her an extravagant sum for her services as geriatric care manager. Her realty firm was his cover' for the receipt of funds as commission for which he had done no work or made no legal agreement.
"He knew or should have known that his conduct violated the Rules of Professional Conduct. The guiding principle must be whether a reasonable attorney, familiar with the Code and its ethical structures would have notice of what conduct is proscribed. . . . [Respondent] was plainly on notice that [his] conduct in this case . . . could be held to reflect adversely on [his] fitness to practice law. [Respondent] knew or should have known that such [conduct] . . . tends to undermine public confidence in the judicial system' (Matter of Holtzman, 78 N.Y.2d 184 (1991)."
The Special Referee also dismissed all seven affirmative defenses asserted by the respondent in his answer to the petition.
Charges Three, Seven, and Eleven
The respondent contests charges three, seven, and eleven only, which each allege that he engaged in dishonesty, fraud, deceit, or misrepresentation, in violation of former DR 1-102(a)(4) (22 NYCRR 1200.3[a][4]), and rule 8.4(c) of the Rules of Professional Conduct (22 NYCRR 1200.0), with regard to the imposition of the surcharge, the sale of the Brideghampton property, and the drafting/execution of the May 8, 2009, and July 9, 2009, wills, respectively.
Charge three alleges that the respondent engaged in dishonesty, fraud, deceit, or misrepresentation with respect to the surcharge matter, which was the subject of an appeal in this Court (see Matter of Albert K. [D'Angelo], 96 AD3d 750). The respondent contends that he merely committed a negligent or reckless mistake that is being unfairly characterized as deceit. In support thereof, the respondent highlights the fact that his payments to his wife and Family Care were "open and notorious," and that he has always comported himself in a candid and truthful manner with regard to the matter.
In sustaining this charge, the Special Referee found that self-dealing is a type of dishonesty, that the respondent's failure to see this is "unconscionable," and that denying it is deceitful. In affirming the surcharge imposed by the lower court, this Court also affirmed the court examiner's legal fees in the sum of $14,625, and to the extent that the fees exceeded the statutory guidelines set forth in 22 NYCRR 806.17(c), this Court found that the respondent's "covert self-dealing demonstrates the requisite extraordinary circumstances' which entitle a court to depart from the statutory schedule" (Matter of Albert K. [D'Angelo], 96 AD3d at 753, quoting 22 NYCRR former 806.17[c]). It cannot reasonably be argued that the respondent did not engage in deceitful conduct when his conduct was found to be a form of "covert self-dealing." The respondent's payments to Family Care, a business solely owned by the respondent's wife, were indirect payments to himself, since the respondent and his wife shared accounts and finances. Using Family Care as a cover for payments to himself was plainly deceptive. There is no merit to the respondent's contention. Accordingly, charge three was properly sustained.
Charge seven alleges that the respondent engaged in dishonesty, fraud, deceit, or misrepresentation with respect to the sale of the Bridgehampton property and payment of $47,100 in unearned commission fees to Castleworks, a brokerage company owned by the respondent's wife. The respondent similarly contends that his conduct was merely negligent, not deceitful. In support thereof, the respondent underscores the fact that Albert K. was in no way harmed by the respondent's receipt of a commission, and that, in fact, the respondent acted to save the estate higher commission fees by insisting that he would not agree to the normal rate of 6% to 7%. The respondent argues that he never tried to hide the transaction through a cash payment, and always candidly testified to receipt of a commission.
In sustaining charge seven, the Special Referee found that the "allegation speaks for itself," reasoning as follows:
"Respondent accepted funds for work unearned. He deposited those [*5]funds in the account of a realty company in which his wife is CEO and he is a signatory on the corporate account. Once deposited, he utilized those funds and distributed them to his and his wife's personal accounts and to pay for other bills. The receipt and deposit of the funds were deceitful acts, which are now recognized by respondent as conduct he should not have undertaken."
The hearing evidence revealed that the respondent created Castleworks, and placed ownership of the company in Ann Marie's name only, ostensibly to avoid any ethical conflict from being both broker and attorney on a real estate transaction. However, following the creation of Castleworks, the company was used only as a cover to disguise an income stream to the respondent. At the time of the sale of the Bridgehampton property, the only person involved with Castleworks to hold a broker's license was the respondent. Upon receipt of the commission, the respondent immediately deposited the check into Castleworks' account and used the funds to pay various bills, including a $25,000 payment to the respondent's law firm for rent and other expenses that Castleworks supposedly owed the law firm. While the respondent sought court approval for the sale, he never disclosed to the court his receipt of the $47,100 in commission fees. On these facts, it cannot reasonably be argued that the respondent did not engage in deceitful conduct. The subject conduct is another instance of "covert self-dealing." Accordingly, charge seven was properly sustained.
Charge eleven alleges that the respondent engaged in dishonesty, fraud, deceit, or misrepresentation with respect to execution of the May 9, 2009, will and the July 8, 2009, will. The respondent contests this charge on the ground that there was no direct evidence, only circumstantial evidence, that Albert K. lacked testamentary capacity to execute the May 8, 2009, will, and argues that the fact that Albert K. may not have understood legalese did not establish lack of competence. In this case the circumstantial evidence that Albert K. did not understand the contents of the May 8, 2009, or July 8, 2009, wills was overwhelming. Twelve years earlier, on June 9, 1997, Dr. James J. Johnson, Jr., conducted a mental status and competency evaluation of Albert K. in connection with the petition to appoint a guardian for him pursuant to article 81 of the Mental Hygiene Law. Dr. Johnson concluded that Albert K. suffered "from a severe and probably progressive neurologic disease known as multi-infarct dementia," and that he had "severe impairment of his language and comprehension of his surroundings." The respondent testified at the hearing that he had been given a copy of Dr. Johnson's report when he was appointed successor guardian to Albert K., and that during the time that he was Albert K.'s guardian, Albert K. had exhibited mental confusion and could not understand complex sentences. The respondent further testified that, at the time that the May 8, 2009, will was executed, Albert K. would not have understood what an "executor" or a "trustee" was. Ann Marie testified at the hearing that by 2009, Albert K. was showing progressively worsening symptoms of aphasia. This evidence supported the Special Referee's conclusion that the respondent's contention that Albert K. understood the contents of the May 8, 2009, and July 8, 2009, wills was deceitful. Accordingly, charge eleven was properly sustained.
Based on the evidence adduced, and the respondent's admissions, the Grievance Committee's motion to confirm the report of the Special Referee is granted, and all twelve charges of professional misconduct are sustained.
In mitigation, the respondent asks the Court to bear in mind that this is not a case of an attorney stealing escrow funds or absconding with settlement proceeds; that he did not engage in deliberate or intentional conduct; that he has never retained Ann Marie as a geriatric care manager on any other guardianship; that he has since withdrawn himself from the list of attorneys eligible to be appointed as guardians; and that he will never in the future accept any matter in which he is not proficient or which poses a risk of a conflict of interest. Citing no authority, the respondent asks that the Court impose a public censure in view of the fact that he has handled dozens of guardianships and all his accountings have been approved, with the exception of Albert K.; a suspension or disbarment would severely impact not only himself, but also all his employees; the individuals who benefit from his pro bono activities would be deprived of a resource; and he is a person of good character as evidenced by newly-submitted character affidavits.
Notwithstanding the aforementioned mitigation, including the facts that the respondent paid in full the surcharged amounts, that the incident appears to be an isolated occurrence [*6]in an otherwise unblemished 30-year career, and that the respondent actively contributes to the Bar and his community and church, we find that the severest of sanctions is warranted (see Matter of Taylor, 113 AD3d 56; Matter of Aversa, 88 AD3d 339). This case involves a course of covert self-dealing by the respondent, who abused his position as guardian of Albert K., an incapacitated person. Albert K., who was elderly, incapacitated, and later terminally ill, was unusually vulnerable. In three separate instances, the respondent acted against the interests of his ward. He exploited his ward's deteriorating mental and medical condition to generate different incomes streams for himself, using his wife as cover, in at least two instances. Of note, the Special Referee found that the respondent demonstrated little remorse for his conduct. Furthermore, the respondent, having been appointed in dozens of guardianship cases, cannot claim inexperience. There were no allegations that the respondent's judgment was clouded by personal circumstances or financial difficulties during the relevant time period.
Under the totality of circumstances, we conclude that the respondent's misconduct warrants his disbarment frm the practice of law, effective immediately.
ENG, P.J., MASTRO, RIVERA, DILLON, and BALKIN, JJ., concur.
ORDERED that the petitioner's motion to confirm the Special Referee's report is granted; and it is further,
ORDERED that the respondent, Frank G. D'Angelo, Jr., is disbarred, effective immediately, and his name is stricken from the roll of attorneys and counselors-at-law; and it is further,
ORDERED that the respondent, Frank G. D'Angelo, Jr., shall comply with the rules governing the conduct of disbarred or suspended attorneys (see 22 NYCRR 1240.15); and it is further,
ORDERED that pursuant to Judiciary Law § 90, effective immediately, the respondent, Frank G. D'Angelo, Jr., shall desist and refrain from (1) practicing law in any form, either as principal or as agent, clerk, or employee of another, (2) appearing as an attorney or counselor-at-law before any court, Judge, Justice, board, commission, or other public authority, (3) giving to another an opinion as to the law or its application or any advice in relation thereto, and (4) holding himself out in any way as an attorney and counselor-at-law; and it is further,
ORDERED that if the respondent, Frank G. D'Angelo, Jr., has been issued a secure pass by the Office of Court Administration, it shall be returned forthwith to the issuing agency, and the respondent shall certify to the same in his affidavit of compliance pursuant to 22 NYCRR 1240.15(f).
ENTER:
Aprilanne Agostino
Clerk of the Court